## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

| | | |
|---|---|---|
| KELLY WEEKS | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| LAMAR UNIVERSITY, a member of the | § | |
| Texas State University System; DR. JAIME R. | § | |
| TAYLOR, in his official capacity as President | § | |
| of LAMAR; DR. BRETT WELCH, in his | § | |
| official capacity as Provost of LAMAR; and | § | |
| MARSHA WORTHY, in her official capacity | § | |
| as Associate Vice President, Human Resources, | § | |
| of LAMAR | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

NOW COMES Kelly Weeks, Plaintiff in the above-styled and numbered cause, and files his Original Complaint against Defendants Lamar University; Dr. Jaime R. Taylor, in his official capacity as President of Lamar, Dr. Brett Welch, in his official capacity as Provost of Lamar, and Marsha Worthy, in her official capacity as Associate Vice President, Human Resources, of Lamar. Plaintiff would respectfully show the Court the following:

## I. THE PARTIES

1.1     Plaintiff Kelly Weeks ("Dr. Weeks" or "Plaintiff") is an individual residing in Hardin County, Texas.

1.2     Defendant Lamar University ("Lamar" or "the university") is an arm or instrumentality of the State of Texas, and is a public university organized under the laws of the State of Texas, located in Beaumont, Texas. Lamar may be served by serving Dr. Jaime R. Taylor

1

in his capacity as President of Lamar University, Office of the President, Lamar University, P.O. Box 10001, Beaumont, TX 77710, or at his office in the Wayne A. Reaud Administration and Honors College, 965 Jim Gilligan Way, Beaumont, TX 77705.

1.3    Dr. Jaime Taylor ("President Taylor") is an individual residing in the Eastern District of Texas, and is the President of Defendant Lamar. He is sued here in his official capacity. He may be served in his capacity as President of Lamar University, through the Office of the President, Lamar University, P.O. Box 10001, Beaumont, TX 77710, or at his office in the Wayne A. Reaud Administration and Honors College, 965 Jim Gilligan Way, Beaumont, TX 77705.

1.4    Dr. Brett Welch ("Provost Welch") is an individual residing in the Eastern District of Texas, and is the Provost or Interim Provost of Defendant Lamar. He is sued here in his official capacity. He may be served in his capacity as Provost of Lamar University, through the Office of the Provost, P.O. Box 20001, Beaumont, TX 77710, Wayne A. Reaud Administration and Honors College, 965 Jim Gilligan Way, Beaumont, TX 77705.

1.5    Marsha Worthy ("AVP Worthy") is an individual residing in the Eastern District of Texas, and is Defendant Lamar's Associate Vice President, Human Resources ("AVP, HR"). She is sued here in her official capacity. She may be served in her capacity as AVP, HR of Lamar University, through her office, P.O. Box 11127, Beaumont, TX 77710, or at her office in Lamar's Human Resources Building, 1060 E. Virginia St. Beaumont, TX 77705.

## II.  JURISDICTION AND VENUE

2.1    This Court has jurisdiction over this action under 28 U.S.C. § 1331 because one or more of Plaintiff's causes of action is created by Federal law, specifically the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12111, *et seq.;* Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794; and Title VII of the Civil Rights Act of 1964

("Title VII"), 42 U.S.C. § 2000e, *et seq.*

2.2    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as all or part of Plaintiff's claims accrued in Jefferson County, Texas, which is within this district and division.

### III.  <u>FACTUAL BACKGROUND</u>

#### A.  OVERVIEW

3.1    Plaintiff Kelly Weeks, a tenured professor in the College of Business at Lamar, sues here for violations of his rights under the ADA and the Rehabilitation Act, including denial of reasonable accommodation and retaliation for seeking reasonable accommodation; discrimination based on his race and sex; and violations of his First Amendment and Fourteenth Amendment rights.

3.2    In his eleven years at Lamar, Dr. Weeks has been a gadfly, a thorn in the administration's side, as he has continually exposed and pushed back against administrative bullying, malfeasance, and other matters of public concern. Lamar's administrators, including, but not limited to, President Taylor, Provost Welch, former Provost Brenda Nichols, former Provost Dan Brown, former Dean Dan French ("<u>Dean French</u>"), and AVP Worthy, have harassed Plaintiff to the point that his health has been ravaged. When he was hospitalized and diagnosed with stress-induced acute pericarditis, he sought reasonable accommodation from Lamar, with the support of his cardiologist and primary care physician.

3.3    Acute pericarditis is a lifelong and life-threatening cardiovascular condition which has sent Dr. Weeks to the emergency room on multiple occasions. Dr. Weeks had no evidence or symptoms of such condition until the hostile working conditions perpetrated by Lamar's administrators.

3.4     To separate himself from the persons and situations which triggered attacks, Dr. Weeks sought fully remote work. He provided Lamar with letters from his cardiologist and general practitioner. As set forth below, Lamar permitted such remote schedule beginning in 2022, but took contrary positions at different times as to whether it had granted the accommodation he sought, or whether that schedule just happened to be assigned him. In 2024, after Lamar changed certain policies to require faculty to maintain an on-campus presence throughout the year, Dr. Weeks again made a formal request for reasonable accommodation, again supported by current letters from his treating physicians, but the request was denied.

3.5     Defendant Lamar has also discriminated against Dr. Weeks as a white male. He has been barred from applying for, or even knowing about, opportunities for administrative positions for which he qualified, and instead such positions were awarded to other, less qualified individuals based outside his protected class. Plaintiff filed grievances, a Texas Workforce Commission complaint under the ADA, and a Title VII charge against Defendant Lamar through the EEOC in an effort to remedy this situation.

3.6     In 2024, despite unanimous support from his departmental committee, Chair, and Dean, Lamar rejected Dr. Weeks' valid request for a market equity salary adjustment. Dr. Weeks' salary at Lamar had always been approximately $30,000 below market for his academic position as an associate professor of Operations Management. When the opportunity was given to obtain an adjustment to bring his salary more in line with the market, Dr. Weeks had support within his school and department. But Lamar, in retaliation for Dr. Weeks' protected activity, including requests for accommodation, allegations of discrimination, and exercise of his freedom of speech, changed his academic title and assignment from Associate Professor of Operations Management to Associate Professor of Management without his knowledge, consent, or any form of procedural

due process. As a professor of "management" rather than "operations management," Dr. Weeks' salary was already at market levels.

3.7    Plaintiff sues for the harms he suffered by Defendants' prohibited conduct, seeking all available relief.

## B.  BACKGROUND AND EVENTS RELEVANT TO ALL CAUSES OF ACTION

### Dr. Weeks joins Lamar as an Assistant Professor of Operations Management

3.8    Plaintiff was hired by Lamar University, a component university of the Texas State University System ("TSUS"), in September of 2014. He accepted an appointment as Assistant Professor of Operations Management, consistent with the job announcement, his doctoral specialization, and the university's offer, at an annual salary of $98,000. Dr. Weeks accepted the offer, despite the annual salary being over $30,000 less than the national average for an Assistant Professor of Operations Management with his experience. Plaintiff's annual contract never specifically named his title; it only generalized his appointment as a professor in the College of Business.

3.9    Over the years, Dr. Weeks observed a pattern at Lamar of favoritism, nepotism, and a preference for treating non-white, female faculty more favorably than white, male faculty. Highly frustrated over this disparate and discriminatory treatment, Dr. Weeks complained, in Fall 2016, to his Dean about the matter.

3.10    Weeks spent years developing a Refinery Operations MBA program, which was blocked in or around 2017, depriving Plaintiff of the leadership role he would have had over the program, and the associated increase in pay. As of 2025, Lamar's College of Business is again considering a graduate degree program in Refinery Operations, but this time at the doctoral level, and without Dr. Weeks.

### Dr. Weeks speaks out on matters of public concern, and is punished

3.11    Since his arrival at Lamar, Dr. Weeks has never hesitated to call out Lamar and its administration on their discriminatory conduct, or other malfeasance. He spoke out at Faculty Senate and College of Business meetings. He sent broadcast emails to colleagues and Faculty Senate senators, and he repeatedly filed grievances. He also exercised his right as a citizen to make open records requests under the Texas Pubic Information Act ("TPIA").

3.12    The matters on which Dr. Weeks spoke out were not limited to matters affecting himself or his own employment situation; these were matters of public concern. Some specific instances are set forth below, but his comments included calling out Provost Welch for lowering academic qualifications, and violating the law with a retroactive pay cut for summer teaching.  Dr. Weeks was determined, both as a professor and as a private citizen, to expose the university's wrongful conduct and misuse of taxpayer money, and he did so for the betterment of the university and the public at large.

3.13    On or about April 3, 2019, Dr. Weeks, then an elected Faculty Senate senator, spoke at a Faculty Senate meeting, calling for a forensic audit to be done on the university, and calling for a vote of no-confidence against then-President Kenneth Evans and then-Provost Marquart. Lamar promptly blocked Dr. Weeks from attending any future Faculty Senate meetings for the next year, completely disregarding its own policies protecting academic freedom. That September, Plaintiff filed a grievance over his removal from the Faculty Senate, and as was typical, Lamar never heard the grievance. Despite the Texas Conference of the AAUP's President having sent the university a letter admonishing the removal as inconsistent with established AAUP principles, Lamar never considered Dr. Weeks' grievance, nor did it rescind his one-year ban.

**After his public call for a no-confidence vote against the university president and provost, Plaintiff receives a death threat against his family, commencing his cardiovascular disability.**

3.14    In or around June of 2019, a little over a month after his call for a vote of no-confidence against President Evans, Plaintiff received a call on his cell phone. The caller threatened to murder Dr. Weeks' family on account of his actions at the April 2019 Faculty Senate meeting. A few days later, Dr. Weeks received a phone call from the Lamar University campus police chief about the threatening phone call, despite Weeks not having disclosed the threatening call to anyone at that point.

3.15    The caller's threat against his family, which included his wife and three young children, resulted in Dr. Weeks experiencing a severe panic attack and chest pain. He was immediately hospitalized. Diagnostic tests revealed Plaintiff suffered from acute pericarditis (*i.e.,* inflammation of the lining around the heart) as a proximate result of the stress he experienced from the hostility of Lamar's administrators, retaliating against him for speaking out against the misconduct, malfeasance, and discrimination by the administration of a publicly funded university.

3.16    Yet, the death threat, Plaintiff's hospitalization, and his pericarditis diagnosis did not deter Dr. Weeks from speaking truth to power. Later that month, Dr. Weeks learned the university had included him on a secret list of faculty members it considered "troublesome" and whom it wanted terminated.

**Lamar discriminates against Plaintiff in compensation, he continues to push back against the administration, and another attack of pericarditis occurs.**

3.17    Between July and September 2019, Plaintiff, after receiving an offer of appointment from Baylor University for a much higher salary, requested an adjustment to his annual salary to be *on par* with the market for his position of Associate Professor of Operations Management. In a meeting with the university's then-President, Kenneth Evans, the President conceded that

Plaintiff's salary should be adjusted based on the Baylor University offer and consistent with procedures delineated in the Lamar University Faculty Handbook. Nonetheless, Dean French, who was then dean of Lamar's College of Business, denied that adjustment. Lamar ignored Plaintiff's subsequent grievance over the issue.

3.18    During the Fall semester of 2021, Dean French and Plaintiff Weeks' interim Chair, Ms. Marlene Swerdlow,[1] refused to credit Weeks for an article he published in the journal *Renewable Energy* as a highest level ("A*") journal, despite French's and others' prior admissions that it was a top-tier journal. Dean French's refusal to properly credit Weeks' publication resulted in Weeks receiving a lower performance evaluation score and associated lower merit-based monetary award (this also lowered the amount of subsequent merit awards Dr. Weeks has received, since his base salary is the beginning point for such awards). Dr. Jerry Lin, Vice President of Research, emailed Dr. Weeks that the journal in question was indeed very prestigious, and that he himself published in it. Plaintiff filed a formal grievance against Dean French over the matter, which, like the others, was never properly addressed.

3.19    On or about December 1, 2021, Plaintiff Weeks once again addressed the Faculty Senate, this time directly questioning President Taylor over his lack of transparency, and condemning the university's history of retaliating against faculty, like himself, whose speech the administration did not like. In like manner, Weeks also alleged possible fraud by Lamar, including the university improperly combining and double-counting classes, counting classes students did not actually take, and faculty chairing as many as sixty doctoral dissertation committees in a single semester, essentially turning the university's doctoral programs into low-quality degree mills.

---

[1] More recently, Defendant created a new department specifically so Swerdlow could remain in a Chair position. She supervises only one person in that capacity. Plaintiff was not afforded any opportunity to apply for that new Chair position.

3.20    Two months after alleging fraud by the university, on February 2, 2022, Plaintiff was set to speak again at a Faculty Senate meeting over potential fraud and abuse by Lamar University and its administration. Before the meeting, Plaintiff Weeks discovered his tires had been slashed in a College of Business parking lot. Dr. Weeks reported the incident to the university police, but neither the campus police nor the university itself ever took action to address the crime.

**The May 9, 2022 meeting – Dean French and others berate Plaintiff for 45 minutes, hospitalizing him with another attack of acute pericarditis; the university then investigates Plaintiff for fostering hostility.**

3.21    On May 9, 2022, Dean French called an all-College of Business meeting. For most of an hour, Dean French, along with instructor and attorney Melissa Baldo, a married pair of Associate Deans, Soumava Bandyopadhyah and Kakoli[2] Bandyopadhyah, and faculty member Paul Howell, vehemently shouted at and excoriated Dr. Weeks in front of all present. Dr. Weeks believed they were attempting to provoke him into lashing out, as their sustained attack blamed him for actions he was entitled to take and comments he was entitled to make. For example, they yelled at him over his vocal criticism of the administration, and admonished him for having filed open records requests.[3] Despite the attack, Plaintiff Weeks kept his composure the entire time, never raising his voice. He told his attackers "*I am willing to answer questions but can we please stop yelling and talk calmly.*" The group ignored Plaintiff's plea, and the yelling fest continued.

---

[2] Dr. Kakoli Bandyopadhyah later stepped down as an Associate Dean, and as with Swerdlow, Defendant manufactured a chair position for her. Defendant denied Plaintiff any opportunity to apply for that new Chair position, as with Swerdlow's position, on account of his being male. Both Kakoli Bandyopadhyah and Swerdlow are female.

[3] Under the Texas Government Code 552.223: Uniform Treatment for Requests for Information of the Texas Public Information Act ("TPIA"), "*[t]he officer for public information or the officer's agent shall treat all requests for information uniformly without regard to the position or occupation of the requestor, the person on whose behalf the request is made, or the status of the individual as a member of the media.*" Here, Dean French not only retaliated against Plaintiff Weeks for having made requests for information, but also treated his requests differently than requests by any other citizen because of his status as a Lamar employee, in violation of the TPIA.

3.22    As the May 9th meeting finally drew to a close, Dr. Weeks began feeling sick and dizzy, followed by severe chest pain and another stress-induced panic attack. Plaintiff rushed to the hospital emergency room. The treating physician determined Dr. Weeks was experiencing another attack of acute pericarditis, triggered by the hostile and abusive working conditions to which Dean French and the others had subjected him at the meeting.

3.23    Lamar University was aware of Plaintiff's 2019 hospitalization for administrator-induced pericarditis, but nevertheless caused Plaintiff physical harm and emotional distress in permitting and creating the environment of the May 9, 2022, attacks against him. These verbal attacks and hostility were motivated by Dr. Weeks' grievances, speech, and open records requests, all of which were protected by the First Amendment. In the face of such retaliation, Dr. Weeks filed a police report the next day for workplace violence.

3.24    Plaintiff deliberately made a point to remain calm and collected during the May 9, 2022, meeting, despite Dean French's and the others' onslaught. Nonetheless, Dr. Weeks soon learned that someone filed an anonymous complaint against him for the creation of a hostile work environment during the May 9th meeting, and that he himself was now the subject of an active investigation by Lamar. During the investigation, Plaintiff discovered the anonymous complaint filing occurred before the meeting even took place. Both complaints were heard by Defendants AVP Worthy and Provost Welch.[4] During their June 28, 2022, investigative meeting, Dr. Weeks asked what he said or did to constitute a hostile work environment. The investigators replied they did not know. In short, the results of their investigations over the complaints were never disclosed to Plaintiff. In the ensuing days, Dr. Weeks received multiple phone calls from faculty colleagues, empathizing with him over the way the Dean and others had treated him, and offering their support.

---

[4] At the time, Dr. Welch was a faculty member, and not yet Provost.

**Events leading to the filing of Plaintiff's first Title VII charge – for which Lamar retaliated:**

### Plaintiff files his first request for reasonable accommodation under the ADA

3.25    Dr. Weeks' cardiologist wrote to Lamar on May 18, 2022, summarizing Dr. Weeks' cardiovascular condition and explaining that Plaintiff's chest pain and severe panic attacks necessitated him avoiding "similar situations" – *i.e.*, the hostile and confrontational work environment at Lamar, such as the meeting nine days before. The cardiologist further wrote: "Given his history of pericarditis, chest pain, and panic attacks it would be optimal for off campus or distance learning activities. These episodes have become quite debilitating for him." A similar letter soon followed from Plaintiff's primary care doctor, concurring with the cardiologist and reiterating Plaintiff's need for remote work as a medical necessity to avoid another life-threatening attack of pericarditis. Plaintiff Weeks forwarded the letters from his cardiologist and primary care physician to HR on May 24, 2022, requesting reasonable accommodation to work remotely. Lamar did not respond.

3.26    Summer break came and went, and still no response from the university to Plaintiff's request for reasonable accommodation. The fall semester began. Plaintiff's Chair and Dean had already scheduled him to teach fully online that semester, but not as an accommodation under the ADA.  But it was apparent the university did take notice of Plaintiff's request for reasonable accommodation under the ADA. Instead of officially accommodating that reasonable request, Lamar, through its administrators, chose to retaliate against Plaintiff for making it.

3.27    In or around September 2022, the university discriminated against Plaintiff on the basis of his disability, and retaliated against him for making his request for reasonable accommodation under the ADA, by applying unequal treatment to Plaintiff's in-house grant application. Despite being more qualified than his colleagues who received grant funding, and

despite his application being the only timely application and the only one fully adhering to the grant's application requirements, Lamar elected to deny Plaintiff full funding of his grant application. As usual, Plaintiff filed a formal grievance and the university ignored his grievance, even after he followed up with both the President and Provost, who refused Dr. Weeks any response.

3.28    Lamar's next retaliatory action, based on Plaintiff's disability and for requesting reasonable accommodation under the ADA, was to attempt to intimidate him with no basis whatsoever. On October 12, 2022, then-Provost Dan Brown ("Provost Brown") called Dr. Weeks into a meeting to "discuss how [Plaintiff was] doing in the Fall 2022 semester." In reality, it was another ambush. Plaintiff arrived at the meeting to find Provost Brown, accompanied by then-Director of HR Robert Wagner. Provost Brown told Plaintiff someone from the Lamar University legal office would also be joining the meeting. Dr. Weeks inquired as to why he was not previously informed of the university's intention to bring a lawyer, so he would know to have his own representation present. Provost Brown did not reply, and no one from Lamar's legal office showed up.

3.29    Provost Brown accused Plaintiff Weeks of violating his workplace accommodation (which the university had never granted, as far as Dr. Weeks was aware) by having attended meetings on campus, including a Faculty Senate meeting. When pressed, the Provost admitted to having never actually read Plaintiff's accommodation request. Dr. Weeks explained to Provost Brown that the request for accommodation made no provision regarding occasions on campus that were not stress-inducing. Plaintiff also highlighted the irony of the Provost calling him into an on-campus meeting to tell Plaintiff he was not allowed to attend meetings on campus. Further, Dr. Weeks asked, how could the Provost admonish him for supposedly violating an accommodation

request, when the Provost had never actually read the request, and Lamar had never informed him of any decision regarding the request? The Provost and HR Director, who were clearly flustered by Plaintiff's questions, could not articulate any meaningful response to either point, and simply replied Plaintiff was "*not in trouble*." When Dr. Weeks then asked if he were allowed to come to campus, Provost Brown replied he would consult with the head of HR and respond back to Plaintiff within two days. The Provost then ended the meeting. Plaintiff never received any response to his question.

### Plaintiff addresses the Faculty Senate and Lamar's CFO regarding $25 million in missing university funds; Plaintiff files a second request for reasonable accommodation; Lamar denies Plaintiff's second request.

3.30    On November 2, 2022, Plaintiff Weeks once again addressed the Lamar University Faculty Senate over matters of public concern. In this instance, he directly addressed the university's Chief Financial Officer, Mark Robinson, regarding allegations that approximately $25 million of the university's "rainy day fund" had gone missing, asking the CFO to find answers and publicly report back to the Faculty Senate where the money went. Later, Plaintiff learned of a possible TSUS investigation of the allegation, which may have prompted the resignation of President Evans. That same year, Plaintiff addressed Dr. Freddie Titus, Vice President of the university's DEI office, during a Faculty Senate meeting, publicly asking him why the university was spending tax payer dollars on creating gender-neutral bathrooms.

3.31    Nearly eight months after submitting his original ADA accommodation request, to which Lamar never formally responded, on January 5, 2023, Plaintiff Weeks submitted another ADA reasonable accommodation request per Lamar University policies and procedures, once again requesting to work remotely on account of his pericarditis triggered by the hostile work

environment at Lamar. On the Lamar University ADA Medical Certification Form, Plaintiff's

doctor wrote

> "[Patient] suffers from non-curable pericarditis [that] has manifested several times the
> past several years, and has been hospitalized more than once. Also has anxiety, panic
> attacks, and has a stressful work environment. Any/all of these situations may
> exacerbate his physical condition."

In response to the form's inquiry as to activities that Plaintiff's disability limits, his doctor wrote

> "Confrontational situations. Also, stressful events (mentally or physically) may
> exacerbate him. He has experienced an inordinate amount of stress within office/in-
> person teaching duties, but remote teaching has allowed him to avoid exacerbations,
> to this point."

The doctor emphasized Plaintiff's remote work accommodation was not simply a suggestion; it

was a medical necessity to be able to perform the essential job functions listed in the job

description:

> "[Dr.] Weeks is being routinely seen and managed by myself and his cardiologist.
> Workspace modifications are a must to address his individual needs so he may perform
> optimally."

and

> "Most definitely needs accommodations. See p. 2 and 8 item. Although he could
> perform work requirements for some time without modifications, he would likely soon
> decompensate. In my professional opinion, I do not advise in-person, on-campus
> placement."

3.32    Defendant AVP Worthy confirmed receipt of Weeks' accommodation request on

January 18, 2023. On February 3, 2023, she emailed Dr. Weeks, diminishing his life-threatening

medical condition and doctor-ordered request for reasonable accommodation under the ADA,

accusing Plaintiff of using his reasonable accommodation request as

> "a vehicle...to eliminate stress incurred in the normal performance of one's job or
> occasioned by interpersonal conflicts in the workplace. [...] Despite your claimed need to
> avoid in-person work interactions, you attended multiple work-related events and meetings
> on campus."

In her letter, Worthy also chided Weeks' attendance at the College of Business's Convocation, failing to acknowledge that faculty attendance at Convocation was a contractual requirement, and that the university, in never providing any written response to Plaintiff's accommodation request, had not authorized Plaintiff to attend remotely.

3.33    After an unproductive appeal meeting with AVP Worthy on February 10, 2023, Plaintiff notified her the following week that he felt Lamar University violated his rights under the ADA, and that he intended to file a complaint with the Texas Workforce Commission ("TWC"). Over a month later, on March 20, 2023, Worthy wrote back, claiming the university had allowed Plaintiff to teach fully online in Fall 2022 and Spring 2023 based on his accommodation request (to which the university never provided a written response) and the letters from his physician; she also stated that based  on the February 10, 2023, meeting and "additional information obtained by [her] office," the university determined "that this modified teaching schedule is not a reasonable accommodation for your impairments." Worthy stated that "absent a change in [Plaintiff's] situation, [Plaintiff's] request to teach only online will no longer be treated as a disability accommodation," and that Dr. Weeks "should make any requests for a modified teaching schedule through the process established by Academic Affairs."

3.34    As Dr. Weeks pointed out to Defendant Worthy, the university never explained how the requested accommodation was unreasonable or how it constituted an undue hardship for the university. "[T]he university has determined that the ADA does not require it to accommodate your medical conditions by offering remote teaching options" was AVP Worthy's response.

**Plaintiff files a complaint with TWC, charging Lamar with discrimination on the basis of his disability, and failing to honor his requests for reasonable accommodation, in violation of the ADA.**

3.35    On June 7, 2023, Dr. Weeks filed complaints with the EEOC and the TWC against Lamar for discrimination on the basis of disability and for violation of the ADA. Defendant Worthy followed with an October 2, 2023, email, stating it had come to her attention there "may be confusion" on Plaintiff's part regarding the status of his remote-work accommodations, referring back to her March 20, 2023, email. Worthy stated she wished to clarify that Plaintiff was "not currently under a disability-related workplace accommodation." She also indicated HR had no record of Plaintiff being granted an accommodation exempting him from in-person attendance at other university functions, despite her prior email questioning him for attendance at on-campus meetings, including the contractually-required Convocation.

3.36    TWC notified Plaintiff he would need to withdraw his EEOC charge in order for TWC to address his case. Accordingly, Weeks withdrew his EEOC charge. TWC notified Plaintiff on June 13, 2023, that it accepted his charge of discrimination (charge number 31C-2023-01092), and on the same day, invited him to participate in mediation. The TWC mediation with Lamar failed, but Plaintiff never received the right-to-sue letter he subsequently requested from TWC. Nonetheless, Lamar retaliated against Dr. Weeks for his protected activity of filing the EEOC charge and the TWC complaint.

**The disparate, discriminatory, and retaliatory actions against Plaintiff Weeks continue.**

3.37    By September 2023, a new, interim Dean was in place, Dr. Lumpkin ("Dean Lumpkin"). Reversing course from Dean French's stance the prior year, Dean Lumpkin considered *Renewable Energy* to indeed be an A* journal, yet Chair Swerdlow refused to abrogate her prior decision on the matter, claiming she does not retroactively award credit for publications. Contrary

to her claim, Chair Swerdlow retroactively gave publication credit to Plaintiff's similarly situated colleague, Karen Neuhauser ("Neuhauser"), who is female and not disabled. When Plaintiff asked Swerdlow why she retroactively gave publication credit to Neuhauser and not him, despite his reporting of extensive research activities on his evaluation (with Neuhauser having no reported research activities on hers), Swerdlow replied "*Because you are not her.*"

 3.38 At Lamar, a faculty member's research publication record, as indicated by each annual performance evaluation score, directly determines the faculty's annual merit-based salary increase. In retroactively granting publication credit to Neuhauser but not Weeks, Chair Swerdlow, as demonstrated by her "*Because you are not her*" statement, reduced Plaintiff's merit-based raise, depriving him of the full amount to which he was entitled, and did so on the basis of his sex and disability; or, in the alternative, she did so in retaliation for his requests for reasonable accommodation under the ADA; or, in the further alternative, she did so in retaliation for Plaintiff's exercise of his First Amendment rights.

### Plaintiff requests market equity adjustment; Provost Welch retaliates through a stealth demotion.

 3.39 In or around April 2024, Plaintiff Weeks requested a market equity adjustment in his annual salary, per Lamar University Handbook procedures. Plaintiff then learned that Lamar had changed his title from Associate Professor of Operations Management to Associate Professor of Management, without his knowledge or consent. Dr. Weeks viewed the move as an attempt by Lamar to justify denying or minimizing his current and prior market equity adjustment requests. That is, as a professor of operations management, he was being paid an annual salary more than $30,000 below market, but by calling him a "management professor," rather than an "operations management professor," Lamar could look to a much lower average comparable salary figure, under which he was arguably not underpaid at all.

3.40    As set forth above, Dr. Weeks accepted his original 2014 appointment offer at Lamar as "Assistant Professor of Operations Management." At the time of his hire, the university issued Plaintiff business cards depicting his title as Assistant Professor of Operations Management. The job description for which Dr. Weeks had applied specifically stated Lamar was looking for someone with an "operations management, supply chai[n], management, manufacturing, or logistics" background. And upon taking the job, Plaintiff taught three Operations Management classes in his first term.

3.41    After achieving the rank of Associate Professor during the 2018-2019 academic year, the university issued Plaintiff new business cards with the title of Associate Professor of Operations Management. Below is a true and accurate copy of that business card:



Lamar never issued any further business cards to Plaintiff designating any other title, including the title of Associate Professor of Management. Upon learning of the change to his title, Plaintiff promptly appealed to Dean Lumpkin, showering him with documentation demonstrating the mistake in his title. After combing Plaintiff's evidence, Dean Lumpkin agreed with Dr. Weeks that his title should be Associate Professor of Operations Management, but told Weeks there was nothing he could do to remedy the situation, since he already submitted his report to the Provost. Dean Lumpkin advised Plaintiff to appeal to Provost Welch.

3.42    Provost Welch, of course, never responded to Plaintiff's appeal over the title change, instead simply stating he would let the market equity request process move forward. That

process ended with the Provost's denial letter on July 11, 2024. This demotion was in further retaliation for Dr. Weeks' EEOC and TWC charge filing; or, in the alternative, it was in retaliation for his ADA requests; or, in the further alternative, it was in retaliation for Dr. Weeks' exercise of his First Amendment rights, as set forth herein, particularly to the extent he criticized Provost Welch.

### In retaliation for Plaintiff's ADA remote work requests and TWC filing, Lamar enacts new policies mandating on-campus presence and office hours.

3.43    In retaliation for Plaintiff's prior requests for reasonable accommodation under the ADA, and his TWC/EEOC filing in 2023, on November 12, 2024, Lamar implemented a new administrative policy, *MAPP 02.02.62: Campus Presence and Engagement*, which provides, "faculty are expected to maintain an on-campus presence so that they may participate in and contribute to campus life." Under *Section III(F)*, the new policy addressed faculty needing accommodations related to on-campus work, stating

> "Faculty entitled to accommodations under the Americans with Disabilities Act (ADA), as amended, should contact their Chair, LU's Accessibility Resource Center (ARC), and Human Resources to discuss faculty residency arrangements in line with their accommodations. The University will comply with ARC-approved accommodations that a faculty member receives, including accommodations that affect a faculty member's campus presence."

At or about the same time, Lamar instituted *MAPP 02.02.61: Faculty Office Hours,* requiring faculty to have three on-campus in-person office hours per week. Exceptions for ADA accommodations are mentioned in the policy, but as set forth below, Lamar, through Defendant AVP Worthy, denied such accommodations when Dr. Weeks requested them.

3.44    Meanwhile, Plaintiff and other males in the College of Business at Lamar continued to be denied equal opportunity as females for advancement in the college. On January 15, 2025, Lamar created a new, yet to be named, administrative position for a female attorney, Toni Mulvaney, ("Mulvaney"). Lamar previously handed the administrative positions of Associate

Dean, and later, Director of Accreditation and Assessment, both of which Plaintiff was qualified, to Mulvaney, skipping any competitive selection process and denying Plaintiff equal opportunity to apply for those positions. Mulvaney, unlike Plaintiff and the tenure-track males in the department, does not possess a Ph.D. in Business.

### Plaintiff files his Title VII charge against Lamar with the EEOC for discrimination on the basis of disability, sex, and race, and files a third request for reasonable accommodation under the ADA.

3.45    In January 2025, Plaintiff Weeks filed a Title VII charge with the EEOC, alleging Lamar University discriminated against him on the basis of sex and race, discriminated against him on the basis of his disability, and retaliated against him for requesting reasonable accommodation under the ADA.

3.46    Given the university's track record for discrimination and retaliation, Plaintiff worried Lamar would use its new *MAPP 02.02.62* policy to disregard his prior requests for accommodation. He decided to submit another remote work accommodation request, this time following the new policy and Lamar's instructions for submission per its Accessibility Resource Center ("ARC") website. On the ARC's "ADA Grievance and Complaint Procedure – Employees with Disabilities" webpage, employees and faculty with disabilities were informed they "must make their need for accommodation known to their supervisor or the Director of Human Resources – Employee Relations (ADA Coordinator)." The ARC's "Disability Documentation Guidelines" instructed faculty that "Documentation may be uploaded into the AIM system with your application, e-mailed to the Accessibility Resource Center at arc@lamar.edu (mailto:arc@lamar.edu), or delivered in-person to the ARC office located in Suite 105 of the Communications Building."

3.47    Lamar's ARC website includes minimal ADA accommodation information for faculty, directing the bulk of its information towards students. For example, on ARC's webpage entitled "Students, Faculty, and Staff," the textual information under the heading "What Faculty Should Know About the ARC," related to faculty only to the extent it instructed faculty on how to address requests by students and explained how students could make accommodation requests by approaching faculty.

3.48    On January 29, 2025, adhering to the university's guidelines for submission on the ARC website, Dr. Weeks submitted his accommodation request, including his most recent doctor's letter, to arc@lamar.edu, copying Defendant Worthy; the Chair of the Marketing and Management Department Dr. Komal Karani ("Chair Karani"); Dean Joby John ("Dean John"); and Defendant President Taylor in the "cc" area of the email.

3.49    After emailing his accommodation request to arc@lamar.edu, Dr. Weeks promptly called the ARC to follow-up on his submission. The ARC employee on the phone informed Plaintiff Weeks its office only handles disability accommodation for students. Faculty, the employee explained, are under a "whole different process;" she then told Plaintiff he would either need to mail or fax his documentation to HR for the university to consider his accommodation request. This separate process for employees, going directly to Defendant Worthy, rather than a committee, is contrary to the stated policies of the university. An ARC employee reiterated this dual system in an email to Weeks that day, copying Defendant Worthy, Chair Karani, ARC, Dean John, and Defendant President Taylor.

3.50    Plaintiff, having followed the requirements of the new policy, but now told that such requirements were incorrect, re-emailed his documentation and accommodation request, this time "To:" Defendant Worthy and his direct supervisors, Karani and John, along with the ARC

(President Taylor was still cc'ed). This time, Plaintiff included copies of the ARC webpages described above with his documentation. In the body of the email, Plaintiff made clear that the directive given him by ARC contradicted its website. Worthy confirmed receipt to Dr. Weeks the next day, copying the others.

### Lamar again denies Dr. Weeks' request for reasonable accommodation

3.51    The "interactive process" meeting between Plaintiff and Defendant Worthy took place February 28, 2025, in which they discussed Dr. Weeks' January 2025, remote work accommodation request. Lamar, through Defendant Worthy, denied Weeks' request to have legal counsel present. The university permitted him only an AAUP representative to be present as an advisor. During the meeting, Plaintiff and his representative emphasized to Worthy his January 2025, accommodation request was not just an extension of his prior requests, but a new request, with new documentation.

3.52    About six weeks later, on April 16, 2025, Worthy (who is not a qualified medical doctor) overruled the recommendation by Plaintiff's physicians. Had Dr. Weeks been a student, his request would have been reviewed by a committee under the ARC process. Instead, he was at the mercy of a single administrator who had previously expressed disdain for his disability and hostility toward his requests.

3.53    In retaliation for Plaintiff's filing of a Title VII charge against Lamar in early January 2025, his subsequent request for accommodation, further criticism of the university and its administration and policies, and his continued outspokenness in the Faculty Senate, Lamar, through Worthy, once again denied Plaintiff's accommodation. The university never offered any claim or evidence that honoring Plaintiff's accommodation would confer an undue hardship or burden on the university. In her denial letter, Worthy sidestepped any reference to Plaintiff's

22

pericarditis as a disability, solely terming it an "impairment," for which the university determined remote work was not a reasonable accommodation. At this point, Dr. Weeks had been teaching exclusively remotely for nearly three years.

3.54    As Plaintiff anticipated, Defendant Lamar University, through Worthy, used its new *Campus Presence and Engagement* and *Faculty Office Hours* policies, which Lamar established, at least in part, in response to (and in retaliation against) Plaintiff's prior accommodation requests and TWC filing, to deny his reasonable accommodation request for remote work, stating

> "As you know, your job position as a Professor in the Department of Business (College of Business) involves teaching in an on-campus degree program. As such, your job responsibilities include campus presence and engagement and on-campus office hours requirements pursuant to *Lamar U MAPP Campus Presence* and Engagement and *Lamar U MAPP Faculty Office Hours*."

Worthy went on to twist and misrepresent Plaintiff's comments during the February 28, 2025, "interactive discussion," and tied his prior requests for accommodation to the new one, stating "there has been no change in your impairment," discounting Plaintiff's permanent and life-threatening pericardial disability.

3.55    On April 23, 2025, Plaintiff emailed Worthy, asking if a process exists for him to appeal her most recent denial of his accommodation request. She replied no such a policy exists, other than the normal Lamar policy for faculty grievances. But Plaintiff already knew how Lamar handles his grievances – it ignores them; then it bullies, intimidates, demotes, discriminates, attempts to silence, and retaliates against Plaintiff for having filed them.

## IV.  <u>CAUSES OF ACTION</u>

4.1    **Alternative Pleadings**.  To the extent necessary, each of the claims set forth below is pleaded in the alternative, and all allegations contained in each count below are incorporated

into each other count by this reference. Further, to the extent necessary, all allegations set forth above in Section III. Factual Background (paragraphs 3.1 through 3.55) of this Complaint are hereby referenced and fully incorporated in each of the claims below by this specific reference, as though set forth in full.

***Federal Claims under the Americans with Disabilities Act***

4.2     Based on some conflict in the authority as to whether Congress abrogated the states' Eleventh Amendment immunity to claims under Title I of the ADA, Dr. Weeks brings his claims of discrimination and retaliation under the ADA against Lamar's administrators, Defendants President Taylor, Provost Welch, and AVP Worthy, in their official capacities.

4.3     Title I of the ADA, 42 U.S.C. § 12111 *et seq.,* ("Title I"), governs employment, requiring employers, including public entities, to provide reasonable accommodations to qualified individuals with disabilities, unless providing the accommodation would cause undue hardship or burden. The ADA also prohibits discrimination and retaliation for engaging in protected activities, such as requesting accommodations.

**Count 1: Discrimination and Retaliation Under the Americans with Disabilities Act against Defendants Taylor, Welch, and Worthy**

4.4     Plaintiff Dr. Kelly Weeks, a tenured professor in the College of Business for over 10 years at Defendant Lamar University, is a qualified individual with a disability under Title I of the ADA, because his pericarditis substantially limits one or more major life activities. Plaintiff is able to perform the essential functions of his position with reasonable accommodation. Defendant Lamar University is subject to ADA's prohibition on disability-based discrimination.

4.5     Plaintiff, as set forth above, made requests for reasonable accommodation to work and teach remotely, as his potentially lethal episodes of acute pericarditis are brought on by the bullying

and hostile work environment generated by Lamar and its administrators. After conducting bad-faith interactive processes, Defendant Lamar refused all Plaintiff's reasonable accommodation requests under the ADA. It is evident that there is no undue hardship since he successfully completed the duties of his job remotely for over two years. Yet, Lamar discriminated against Plaintiff by denying his requested reasonable accommodation.

4.6     The university's denial of Plaintiff's remote work accommodations, without good-faith interactive engagement or assessing undue hardship or burden, violates ADA's mandate. Plaintiff was qualified for his role, and his requested remote work accommodations would enable his performance of essential duties without disrupting university operations,[5] consistent with Title I standards.

4.7     As set forth in Section III of this Complaint, Lamar University also retaliated against Plaintiff for requesting reasonable accommodations. Further, when Dr. Weeks and Lamar participated in the TWC process following the filing of his 2023 charge, AVP Worthy told TWC's representative that Dr. Weeks' contract required him to be on campus. He showed the TWC his contract, which contained no such provision. As set forth above, Lamar thereafter enacted policies (1) which were retaliatory in themselves, if not facially then as applied to Dr. Weeks; and (2) which enabled further retaliation against Dr. Weeks. This discriminatory and retaliatory application of policies to Dr. Weeks is partly evidence by the fact that in 2024 many full-time Lamar faculty[6] lived outside Texas, and even outside the U.S.. These faculty, upon information and belief, had no disabilities under which they were required to seek accommodation to permit their lack of campus presence.

---

[5] Defendant demonstrated this multiple times in the past, assigning Plaintiff fully remote teaching schedules through the College of Business, but refusing to acknowledge those arrangements as ADA accommodations.
[6] At least 26 in 2024.

4.8    Lamar's denial of Plaintiff's medically supported request for remote work to address the university's hostile work environment promulgated by Lamar's administrators, coupled with its failure to engage in a good-faith interactive processes, continues to violate the ADA. Pursuant to the doctrine of *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908)), this Court may enjoin state officials to conform their future conduct to the requirements of federal law. Plaintiff therefore seeks all relief permitted under the ADA, including injunctive and prospective relief ordering Defendants President Taylor, Provost Welch, and AVP Worthy, in their official capacities, to grant Dr. Weeks' request for reasonable accommodation.

### Count 2: Discrimination and Retaliation Under Section 504 of the Rehabilitation Act of 1973

4.9    Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, mandates that no qualified individual with a disability may be subjected to discrimination in any program or activity receiving Federal financial assistance, and obligates recipients, including public universities, to provide reasonable accommodations unless they demonstrate undue hardship. Section 504 also prohibits retaliation against those individuals for engaging in protected activities, such as seeking accommodations or filing discrimination complaints. Plaintiff Weeks' pericarditis, a disability substantially limiting one or more major life activities, qualifies him under Section 504, and he remains capable of fulfilling his professional duties with the appropriate and reasonable accommodation of remote work.

4.10    Defendant Lamar University, a Federally funded institution, falls under Section 504 requirements. As set forth in detail above, Plaintiff submitted multiple requests, backed by medical documentation, for remote work to counter the physically adverse effects of Lamar's hostile work environment. The university, acting in bad faith, dismissed Plaintiff's requests, with no evidence

of undue hardship, and retaliated as set forth above, including changing its own policies to make "on-campus presence" a new requirement for faculty.

 4.11 Lamar's refusal to grant Plaintiff Weeks' requests for reasonable accommodation violated Section 504's core principle of ensuring non-discriminatory access to Federally funded programs, including employment. By creating sham interactive processes and failing to justify its denial of remote work with any showing of undue hardship, the university neglected its obligation to engage meaningfully with Plaintiff to reasonably accommodate his disability. Section 504 requires recipients of Federal funds take affirmative steps to accommodate disabilities (*See Chairi v. City of League City,* 920 F.2d 311 (5th Cir. 1991)); a duty Lamar University ignored. Plaintiff's qualifications and the feasibility of remote work underscore the discriminatory nature of the university's actions, which prevented Plaintiff from performing his role safely and effectively and caused significant professional harm.

 4.12 For exercising his rights under Section 504, Defendant Lamar University also retaliated against Plaintiff. As set forth above. Section 504 protects against reprisals upheld under analogous anti-discrimination statutes (See *Pinkerton v. Spellings*, 529 F.3d. 513 (5th Cir. 2008)). The university's actions, detailed above, inflicted emotional distress in the form of physical and mental anguish, career stagnation, and financial losses on Plaintiff, compounding the effects of the university's hostile work environment.

 4.13 Lamar University cannot shield itself with Eleventh amendment immunity from liability under Section 504 of the Rehabilitation Act. In *Lane v. Pena*, 518 U.S. 187, 116 S. Ct. 2092, 135 L. Ed. 2d 486 (1996), the Supreme Court affirmed that Congress, through the Spending Clause, conditioned Federal funding on a waiver of immunity for Section 504 violations. *Thomas v. Univ. of Houston*, 155 F. App'x 115 (5th Cir. 2005) applied that principle, holding a Texas public

university's acceptance of Federal funds to waive immunity for Section 504 claims.[7] Defendant Lamar University receives such funds.

4.14    Plaintiff therefore sues for all relief permitted under Section 504, including his economic damages, an injunction requiring the university to grant Plaintiff's remote work accommodation, or a comparable alternative, his attorney's fees, and all other relief to which he may be entitled.

### Count 4: Discrimination and Retaliation Based on Sex and Race Under Title VII of the Civil Rights Act of 1964

4.15    Title VII, 42 U.S.C. §2000e, *et seq*., prohibits employers, including public universities, from discrimination based on race, color, sex, religion, or national origin "with respect to [an employee's] compensation, terms, conditions, or privileges of employment." Specifically, Title VII bars employers from imposing unequal terms in hiring, promotion, pay, or other employment conditions based on those protected characteristics, and safeguards employees from retaliation for engaging in protected activities.

4.13    Incorporating all preceding paragraphs of this Complaint, Defendant Lamar University discriminated against Plaintiff Kelly Weeks, who is white and male, on the basis of his race and sex by restricting him from consideration for multiple administrative positions for which he was qualified, and instead awarding those positions to female and non-white candidates with lesser qualifications. In 2025, for example, an ombudsman position was open, and although Dr. Weeks was the only applicant who met the job criteria, the position was given to Dr. Chun-Da Chen, an Asian male, who is a professor in the College of Business. Also in 2025, Dean John refused Dr. Weeks' request to post the position of associate dean, which was open. Instead, Dean

---

[7] See also 42 USCS § 2000d-7, "Civil rights remedies equalization," providing that a State is not immune under the Eleventh Amendment for violations of section 504, and that all remedies, at law or in equity, are available against a State for such violation, to the same extent as any other entity.

John appointed an assistant professor, Gevorg Sargasyn, who is originally from Armenia, as "interim" associate dean, since he was admittedly unqualified.

4.14    In addition to the positions for which Dr. Weeks applied and was not selected, there have been many posts in the College of Business which were filled with no open process for applications at all. Going back to 2015, appointments to administrative posts have been routinely made without posting the openings, making it impossible for Dr. Weeks, or others, to apply. In virtually every case, such positions are awarded to faculty who are outside Dr. Weeks' protected classes of white and male. As set forth above, positions are filled or even created specifically for particular individuals, regardless of qualification.

4.15    As set forth above, in addition to discriminatory appointments, the university denied Plaintiff retroactive credit for his publication in a prestigious journal, asserting credit could not be applied retroactively, while granting such benefit to a similarly situated female colleague.

4.16    In 2024, Lamar University, through its Provost, rejected Plaintiff's application for a market equity pay increase, despite endorsement from his departmental committee, Chair, and Dean, and then reclassified his title from Associate Professor of Operations Management to Associate Professor of Management, without his knowledge or consent, to justify his approximately $30,000 below-market annual salary. Similarly situated non-white, non-male faculty faced no such actions. Additionally and alternatively, this action, if this was not discrimination, was taken in retaliation against Dr. Weeks for filing his previous complaint of discrimination with the TWC.

4.17    All of these actions and decisions by Lamar adversely affected the terms and conditions of Dr. Weeks' employment, based on his sex or race, in violation Title VII. Additionally

and alternatively, these actions and decisions constitute retaliation against Dr. Weeks based on his previous complaints of discrimination to the TWC and EEOC.

4.18    In January 2025, Plaintiff signed and promptly submitted an EEOC charge under Title VII against Lamar for (1) discrimination on the bases of sex and race, and (2) for retaliation. His charge was assigned EEOC Number 832-2025-00147.

4.19    As set forth in his January 2025 EEOC charge, Lamar's discriminatory and retaliatory acts, through its administrators and other agents, denied Plaintiff equal treatment in the terms, conditions, and privileges of his employment on the basis of his sex and race, and in retaliation for his previous reporting of discriminatory and disparate treatment to the TWC and EEOC. In doing so, Defendant Lamar University caused Plaintiff substantial financial loss, stalled career progression, and resulted in mental and physical anguish (including exacerbation of his pericarditis), as detailed in this Complaint, robbing him of opportunities afforded to others. Plaintiff received his Notice of Right to Sue from the EEOC on February 7, 2025, notifying him of his right to sue within ninety days on his claims under Title VII. After exhausting his administrative remedies, Plaintiff Weeks has timely brought this lawsuit within ninety days of receipt of his Right to Sue letter.

4.20    Once Plaintiff filed his January EEOC charge, Lamar retaliated against him for that protected activity as well, conducting a sham interactive process for his third reasonable accommodation request, denying his request to have legal counsel present during the meeting, creating an intentionally confusing process for applying for the reasonable accommodation, and in the end denying his request, providing as the only appeal from such decision the normal faculty

grievance process (under which his previous grievances were routinely ignored). These actions constituted retaliation for the filing of Dr. Weeks' January 2025 EEOC charge.[8]

### Count 4: 42 U.S.C. § 1983: Deprivation of Liberty and Property Interests in Violation of the First and Fourteenth Amendments

4.21    Plaintiff brings this claim under 42 U.S.C. § 1983, against Defendants President Taylor, Provost Welch, and AVP Worthy, in their official capacities, seeking prospective and injunctive relief. As employees and administrators of a public university, these defendants (the "Administrator Defendants") are state actors subject to § 1983 liability. The Eleventh Amendment may shield the university itself from claims under § 1983, but claims against individual administrators in their official capacities, for prospective or injunctive relief, to halt ongoing Constitutional violations, is permitted. *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908)). Plaintiff seeks such relief for violations of his Constitutional rights under the First and Fourteenth Amendments.

4.22    The Administrator Defendants, along with others, enacted the retaliation against Dr. Weeks for exercising his rights under the First Amendment, as well as depriving him of equal protection and due process; moreover, these administrators have the authority to take corrective action, if mandated by this Court.

4.23    For his First Amendment retaliation claim, Dr. Weeks would show that (1) he suffered an adverse employment decision; (2) his speech involved a matter of public concern; (3) his interest in commenting on matters of public concern outweighs Lamar's interest in promoting efficiency; and (4) his speech motivated the adverse employment decision.

---

[8] Dr. Weeks intends to file an additional EEOC charge based on such retaliation, along with the new denial of reasonable accommodation, and will amend this Complaint to add such charge when he receives his notice of right to sue.

4.24    The adverse employment decisions suffered by Dr. Weeks include the actions set forth above by which he was deprived of increases in salary to which he was entitled, stripped of his academic title without any procedural due process; subjected to outrageous bullying which brought on a life-threatening condition, and then denied reasonable accommodation for the very disabling condition which the University's actions caused.

4.25    Plaintiff's protected speech included vocal criticism of administrative conduct through Faculty Senate speeches, broadcast emails to colleagues, filing of numerous grievances and encouragement of others to file grievances, calls for a no-confidence vote against the former president and provost, and a plea for an investigation into possible misuse of taxpayer funds. As a public employee, Plaintiff's speech addressed matters of public concern – university governance, faculty rights, and possible misuse of public funds, including administrative malfeasance and fiscal non-accountability by taxpayer-funded university administrators. And so, Plaintiff's speech, both as a faculty member and as a citizen,[9] satisfies the *Pickering* standard (*Pickering v. Bd. of Educ.* 391 U.S. 563 (1968)), which balances an employee's right to speak against an employer's interest in efficiency. Moreover, Plaintiff's many grievances, which span 10 years, were protected by his First Amendment right to petition, which, as the Supreme Court held in *McDonald v. Smith*, 472 U.S. 479, 105 S. Ct. 2787, 86 L. Ed. 2d 384 (1985), is "*cut from the same cloth*" as his right of Free Speech as a public employee addressing public concerns.

4.26    The university retaliated through intimidation and verbal abuse, as set forth above, denial of merit and equity raises (even surreptitiously reclassifying Dr. Weeks in an effort to legitimize such denial); and denials of requests for reasonable disability accommodation (to the point of re-writing a policy regarding faculty presence on campus to support such denials). Such

---

[9] Held in *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969), neither students nor faculty surrender their rights as citizens "*at the schoolhouse gate*."

retaliation, motivated by Plaintiff's protected speech, caused financial and potentially medical damage to Plaintiff, as well as chilling Plaintiff's protected speech, Academic Freedom, and right to petition for a redress of grievances. For that reason, this retaliation against Plaintiff constitutes deprivation of his liberty interests protected under the First Amendment (*See Perry v. Sindermann*, 408 U.S. 393 (1972); *Connick v. Myers*, 461 U.S. 138 (1983); and *Buchanan v. Alexander*, 919 F.3d 847 (5th Cir. 2019), protecting public employees' speech on public issues, and holding that retaliation against protected speech implicates a liberty interest when it stifles public employees' expressive rights). By retaliating against Plaintiff's speech without any procedural due process, the administrators deprived him of his liberty interests without due process, hence violating the Fourteenth Amendment. These actions warrant injunctive and prospective relief under *Ex parte Young*.

4.27    Similarly, the university violated Plaintiff's Fourteenth Amendment rights to equal protection and due process, depriving him of a valuable property interest in his designation as a professor of "Operations Management." By changing Plaintiff's title from Associate Professor of Operations Management to Associate Professor of Management, without notice or hearing, to justify denying his market equity salary adjustment, the university demoted him and deprived him of his property interest in his academic position; the change in position was a demotion which diminished the value of his position by $30,000 per year. Under *Texas Education Code 51.942*, tenured professors are guaranteed continuation in their academic position absent a show of good cause through due process. No cause was established, and no process afforded, violating due process as articulated in *Bd. of Regents v. Roth*, 408 U.S. 564 (1972).

4.28    Plaintiff is entitled to judgment ordering the Administrator Defendants to restore his title as a professor of Operations Management, giving effect to the $30,000 salary increase

recommended in 2024, as of Fall 2024 (or as of such earlier time as may be shown to be appropriate), and permitting him a fully remote schedule, other than as his disability may allow.

## V.  <u>REQUESTED RELIEF</u>

5.1    As the direct and/or proximate result of Defendants' actions complained of herein, Plaintiff has been damaged and seeks recovery of the full measure of relief and damages against the Defendants permitted by law, including (a) actual and/or economic damages, nominal damages, if applicable, damages for mental and physical anguish and emotional distress, equitable relief, and compensatory damages against the University for discrimination and retaliation in violation of Title VII; (b) economic damages and equitable relief against the University for discrimination and retaliation in violation of the Rehabilitation Act; (c) prospective and injunctive relief against the Administrator Defendants, in their official capacities, for violations of the ADA; (d) prospective and injunctive relief against the Administrator Defendants in their official capacities for violations of Dr. Weeks' constitutional rights; and (e) such other relief to which he may be entitled.

## VI.  <u>FEES, COSTS, AND INTEREST</u>

6.1    Plaintiff has retained the law firm of Hill Gilstrap, P.C. to represent him in connection with this matter, and has agreed to pay the law firm its reasonable and necessary attorneys' fees and costs in connection with such representation. Without waiving and/or limiting any other relief requested, Plaintiff seeks to recover his reasonable and necessary attorneys' fees and costs incurred and to be incurred in bringing this suit and in all appeals of this suit, as permitted by law or in equity, specifically including 42 U.S.C. § 2000e-5(k); 29 U.S.C.S. § 794a(b); 42 U.S.C. 1988; and 42 U.S.C. § 12205.

6.2     Plaintiff is also entitled to and seeks to recover costs of court, expert witness fees, and pre-judgment and post-judgment interest at the maximum rate permitted by law.

## VII.  <u>CONDITIONS PRECEDENT</u>

7.1      All conditions precedent to the Plaintiff's recovery on the claims alleged herein have been performed or have occurred.

## VIII.  <u>DEMAND FOR JURY TRIAL</u>

8.1     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff requests a jury trial and has tendered, or will tender, the requisite fee.

## <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that upon final hearing, Plaintiff recover judgment against Defendants and be awarded:

(a)     any and all amounts recoverable and/or recognizable as damages under law and/or in equity, resulting and/or occasioned by the wrongful acts and/or conduct of Defendant Lamar (as set forth above more specifically), including both actual and nominal damages;

(b)     prospective injunctive relief against the Administrator Defendants in their official capacities (as set forth above more specifically);

(c)     his litigation expenses and costs, including but not limited to his attorneys' fees and costs and any applicable expert fees, against Defendant Lamar;

(d)     costs of court, pre-judgment and post-judgment interest, at the maximum rate as allowed by law; and

(e)     such other and further relief, both general and special, at law or in equity, to which he may be justly entitled.

Respectfully submitted,

/s/ *Frank Hill*
FRANK HILL
Texas Bar No. 09632000
fhill@hillgilstrap.com

STEFANIE M. KLEIN
Texas Bar No. 11565650
sklein@hillgilstrap.com
HILL GILSTRAP, P.C.
1400 West Abram Street
Arlington, Texas 76013

**COUNSEL FOR PLAINTIFF
KELLY WEEKS**